Staunton.

W. D. HINES, DIRECTOR GENERAL, ETC., V. ELIZABETH
BUCHANAN.

September 28, 1921.

1. CARRIERS—*Loading and Unloading—Loss From Improper Loading.*
—The general rule with respect to loading and unloading goods
transported by a common carrier is that these duties attach to
the carrier, and it is responsible for loss, or injury, incident
thereto. But the shipper, for purposes of his own convenience,
may assume these duties. In such case the carrier is absolved
from responsibility for injuries received in transportation that
are traceable solely to improper loading and packing.

2. CARRIERS—*Loading and Unloading—Loss From Improper Loading
—Other Negligence of Carrier.*—When there is evidence tend-
ing to show that the goods were not properly packed by the
shipper, and they arrive at their destination in a damaged con-
dition, but the carrier neither avers, nor furnishes evidence,
that it was free of negligence, there is a presumption that there
was sufficient negligence by the carrier in the course of trans-
portation to justify a verdict for the plaintiff.

3. CARRIERS—*Usages and Customs—Inspection of Car Loaded by
Shipper—Case at Bar.*—In the instant case, an action for dam-
ages against a carrier for injury to goods shipped, the plaintiff
undertook to prove by a foreman of another railroad company
the general usage, in the matter of inspection of cars loaded
by the shipper, common to the railroads in the City of Rich-
mond. The witness testified that all he knew was the practice
of the railroad by which he was employed, and he knew nothing
about the practice of defendant railroad, and that he never
worked for it.

   *Held:* That the witness was not qualified to testify as to the
   practice of defendant railroad in the matter of inspection, and
   his evidence in that regard had no probative value.

4. CARRIERS—*Usages and Customs—Inspection of Car Loaded by
Shipper—Case at Bar.*—It was clear from the testimony in the
instant case that it was not the practice of defendant railroad
company to make inspections of carloads loaded by shippers,
nor was there any reason why they should do so, having in mind

that the cars are placed for the convenience of the shipper, and he undertakes the task of loading. If he is negligent in that respect, he should be responsible for the consequences of his own acts. Quite a different question would be raised, if the improper loading was manifest to ordinary observation when the car was received. But such was not the situation in the case in judgment.

5. CARRIERS—*Car Loaded by Shipper—Duty of Inspection by Carrier—Case at Bar.*—In the instant case the car, an ordinary box car, was packed by the shipper. The door was left open, but the extent of the opening was not given. Whether or not the sealer as he walked by the car could see into the interior was not stated. The sealer could have pushed back the door and inspected the contents, but it was not incumbent upon him to do this, and there was no evidence to show that as the sealer discharged his task of sealing the car, the insufficiency of the packing was manifest to him, in the exercise of ordinary observation.

    *Held:* That the railroad company was not liable for losses from injuries to the contents of the car solely due to the insufficient packing.

6. CARRIERS—*Car Loaded by Shipper—Defective Packing—Case at Bar.*—The testimony of the witnesses in the instant case plainly showed that the shipper's agents were guilty of gross negligence in loading the car. The physical facts established the contention that the furniture with which the car was loaded was not properly packed when it left the place of loading.

    *Held:* That if the railway company subsequently handled the shipment with the care appropriate to a properly loaded car, then the injury to its contents was traceable exclusively to the negligence of plaintiff's agents in packing and loading.

7. CARRIERS—*Car Improperly Loaded by Shipper—Evidence Rebutting Presumption of Carrier's Negligence—Case at Bar.*—In an action by a shipper against a carrier for injury to goods shipped, it appeared that the car in which the goods were shipped was improperly loaded by the shipper's agents. Witnesses for defendant railroad gave in detail the movement and location of the car from the time of reception to the date of delivery, showing very clearly that nothing happened *en route* to cause injury to a properly packed car. The car was delivered at the place of destination in good condition, and while no special inspection was made at that point, it was reasonably apparent that if the car had shown any external signs of injuries received in transit, they would have been manifest to plaintiff's agents when they set about the task of unloading. But no such signs were perceived by them.

*Held:* That this testimony satisfactorily negatived the presumption of negligence in handling in the course of transportation.

Error to a judgment of the Law and Equity Court of city of Richmond in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Munford, Hunton, Williams & Anderson,* for the plaintiff in error.

*T. Justin Moore,* for the defendant in error.

SAUNDERS, J., delivered the opinion of the court.

This is a writ of error awarded on the application of the Director General of Railroads, United States Railroad Administration, operating the system of the Richmond, Fredericksburg and Potomac Railroad Company, to a judgment of the Law and Equity Court of the city of Richmond in the sum of $740, entered in January, 1920, on a motion for judgment on the part of Elizabeth Buchanan against the said Director-General. There is a companion suit to this proceeding, in which the said Elizabeth Buchanan is plaintiff and Smith and Hicks, Incorporated, are defendants. (See *ante,* p. 1.) In the first case the plaintiff in error is the director general; in the second, Elizabeth Buchanan. Originally, Mrs. Buchanan sued the Director General and Smith & Hicks jointly, but the court held that the liability alleged was several, and should be determined in a separate action against each defendant. Thereupon, the plaintiff instituted several actions, and both cases were heard and decided by the Law and Equity Court on the same evidence, a jury being waived, and all matters of

law and evidence submitted to the court. The judgment of the court was favorable to the plaintiff in the action against the Director-General, and adverse in the action against Smith and Hicks. In the first case a writ of error was awarded the Director-General, and in the second case one was secured by the plaintiff, the said Elizabeth Buchanan.

These actions arose out of a shipment by the plaintiff of certain articles of valuable furniture and household effects from her home in Richmond to a new home in Atlantic City, New Jersey. The Smith and Hicks Corporation was employed to remove, crate and ship this furniture to Atlantic City. Certain features of this contract of employment will be adverted to later. About September 10, 1918, Mrs. Buchanan notified Smith and Hicks that she wished the shipment of her effects to be made. Thereupon, representatives of the said corporation went to the plaintiff's house in Richmond, and took charge of the crating, hauling, packing, loading and shipping of said effects. These goods were to be loaded in a car which Mrs. Buchanan had ordered, and had had placed for convenience of loading at the old base-ball park in Richmond. This car was a suitable box car, in good condition, the property of the Atlantic Coast Line, but in charge of and operated at the time by the Richmond, Fredericksburg and Potomac Railroad Company. After Smith and Hicks loaded the car, they turned the same over to the railroad company on the evening of September 10, 1918, taking therefor an order-notify bill of lading, with the following notation on its face: "S. L. and C., R. F. and P. R. R. Co. and connections not responsible for number or condition of packages;" that is to say, shipper's load and count, Richmond, Fredericksburg and Potomac Railroad Company and connections not responsible for number or condition of packages. Another notation on the bill of lading was to

the following effect: "Unusual conditions prevail on the lines of the carriers which will handle this shipment, and it is subject to delay."

About a week after the bill of lading was issued—to be exact, eight days—the car reached Atlantic City. The concern of William Heald Company of that city was employed to unload the car, and transport its contents to Mrs. Buchanan's house. William Graham, an employee of said company, broke the seal and entered the car. He immediately noted that its contents were in the utmost confusion. He took a couple of pieces of furniture to plaintiff's home, and reported the condition of the shipment. Thereupon Mrs. Buchanan, and, at her request, Ellis H. Evans, the manager of the Heald Company, proceeded to the car to make an examination of the contents. This examination confirmed the report of Graham. The contents of the car were in a state of wild disorder. The floor was littered with broken bits of furniture, books and shattered graphophone records. In the language of one witness, "Pieces were broken off of almost everything. It was chipped, and it was strewn over the floor of the car." "There was no indication of bracing," and "nothing at all in place to indicate that there was any packing done in the car." Citing this witness further, "There was no semblance of a packing job in the car to my idea of the way furniture of that description should have been packed. It appeared to be thrown in there in any sort of fashion." "There was not enough lumber to crate any one piece that I recognized, unless possibly a light chair." The furniture in the car was badly scarred, and practically it was all damaged. Several of the mirrors were left on the pieces to which they belonged. A witness acquainted with the values of second-hand furniture, said that the "damage inflicted had depreciated the value of the furniture as of the time of shipment at least one half." The car was about two-thirds full, the actual weight of the contents being about

7,400 pounds, but said contents were shipped as 12,000 pounds, the minimum for a carload lot. This shortage of contents emphasized the necessity for proper bracing to prevent oscillation of said contents under the shocks and jars incident to the ordinary handling and movement of freight trains.

Having ascertained the extent and character of the mischief done, Mrs. Buchanan made demand upon Smith and Hicks and the railway company for the damages sustained. Each defendant denied responsibility, and insisted that the other was responsible. Ultimately, as noted *supra,* both defendants were sued in several actions. We are now concerned with the case against the railway company.

In her declaration in this action, the plaintiff alleged that she employed Smith and Hicks, Incorporated, to "pack, crate, transfer, haul, load and ship" the furniture and other articles in question; that these parties were to "exercise ordinary care generally in the manner of handling, hauling, packing and shipping said furniture, etc., and particularly to wrap and pack securely in the car said household goods and effects; that in violation of their undertakings in this regard said Smith and Hicks negligently hauled, carried, transferred, loaded and shipped said goods and effects, with an utter disregard of consequences; that they wholly failed to crate, wrap, load, brace and pack securely, or to crate, wrap, or pack, in any manner, said furniture and effects; that as the proximate result of the negligence of said Smith and Hicks, its agents, etc., together with the concurring negligence of the carriers concerned in the transportation, the goods of the plaintiff were greatly damaged."

It will be noted that with respect to Smith and Hicks, the plaintiff charges specific failure in the first instance to crate and wrap her goods in proper fashion, and in the second instance to load and brace these goods in like fashion

in the car. With respect to the railroad company, she alleges that this negligence of Smith and Hicks in the matter of packing, crating and shipping her effects was, or should have been, perfectly obvious to said company; that it was the duty of said company to inspect the car to determine whether its contents were loaded with reasonable care, and in such manner that they could be carried safely, and to carry same safely, without accident, or mishap, and without unnecessary jarring, jostling and shaking of the same; that in violation of its duties in these regards the defendant company, its agents and employees, wholly failed to exercise ordinary and reasonable care, or any degree of care to inspect said car at Richmond, or elsewhere, to determine whether its contents were loaded in such manner that they could be safely carried in the ordinary course of transit, though such inspection would have disclosed that the car was not properly packed, and that transportation of same in the condition existing would be likely to cause damage; that the defendant did jar, jostle and shake the car in question negligently, unnecessarily and improperly, and carry the same in such a negligent manner, other than in the usual course, that the contents were damaged, said negligence concurring with the negligence of Smith and Hicks in the matter of loading and packing.

It will be noted from the foregoing abridgement of the allegations of the statement of the plaintiff's case, that she rests her claim against the defendant, the Director-General, upon the ground that he was aware, or would have been aware if he had discharged his alleged duty of inspection, that the contents of the car in question were imperfectly prepared in the first instance, and insufficiently packed in the second; (2) that with this knowledge, actual or imputed, he handled the car in so negligent and improper a fashion, and with such a multiplicity of unnecessary bumps, shocks, jars and jolts, that the contents of the car were

churned up to the extent established by the witnesses who inspected said contents in Atlantic City upon the termination of the trip.

In this connection it will be necessary to consider certain questions of law.

First: Did the plaintiff assume responsibility for loading the car, and for damages resulting from improper loading?

It has been noted that under the original bill of lading the plaintiff, (*i. e.,* the shipper), was to load the car and count the contents, the R. F. & P. R. R. Company disclaiming any responsibility for the number or condition of the packages constituting the shipment. The goods were neither delivered at the depot of the defendant, nor handled by its employees. The plaintiff secured a car, and had it placed at a point, presumably of convenience, for the agents who had the contract for crating, packing and loading her furniture and other effects.

[1] The general rule with respect to loading and unloading goods transported by a common carrier is that these duties attach to the carrier, and it is responsible for loss, or injury, incident thereto. But the shipper, for purposes of his own convenience, may assume these duties. In such case, by the plainest principles of justice, the carrier is absolved from responsibility for injuries received in transportation that are traceable solely to improper loading and packing.

"A shipper who, to save charges, or for his own convenience, or for any other reason, loads the property himself, is not the agent of the carrier in so doing, and the latter is not responsible for his negligence in loading the car." Moore on Carriers (2d ed.), p. 193.

"The owner of goods cannot hold a carrier liable where the loss, or injury, is the result of his own fault, or that of the consignor, in loading or packing the goods. There

can be no doubt that the doctrine stated is solidly founded on principle, but there is sometimes difficulty in determining whether the fault of the owner, or consignor, was the cause of the loss of the goods, or of the injury to them." 5 Am. & Eng. Ency. L., p. 368.

"So where the owner of goods has unskilfully packed, or loaded them, * * the carrier will be exonerated from all liability for losses which result from such carelessness of the owner." Hutchinson on Carriers, sec. 216.

"If the shipper assumes the responsibility of loading and unloading, the carrier is thereby relieved from liability for loss in that connection." 6 Cyc. p. 381.

"The carrier is not responsible for loss of, or injury to, goods occasioned by their being improperly loaded on the cars of the shipper." Moore on Carriers, *supra,* p. 560.

In *Ross* v. *Troy & Boston R. Co.,* 49 Vt. 364, 24 Am. Rep. 144, certain machinery was damaged due to insufficient fastenings employed by the plaintiff in loading. This loading had been done by the plaintiff. The court said on page 368 of 49 Vt., on page 145 of 24 American Reports, *supra:* "Is the defendant chargeable with the consequences of that insufficiency. We think not in the sense in which the county court seems to have regarded it. The undertaking and duty of the defendant was to transport and deliver safely against all contingencies save the act of God, public enemies, and the acts of the parties shipping the property. It was the insurer against everything but those. But as against them, it was bound only to the exercise of reasonable care and diligence." The circumstances of the accident are described by the court: "In the case before us, the testimony is that the blocking, under the large wheel that finally gave way and caused the injury, was in its place, and did not appear to have been started, or stirred at all, and the only defect in it was that it was insufficient in the first place.

"It seems incongruous for the plaintiff to claim that the

defendant should overjudge him in a matter in which he assumed to *judge,* and to *do* all that he required, or supposed *necessary* to be done in the premises, and that the defendant should be *responsible* for the *inadequacy* of what the *plaintiff adjudged* and *did.*" (Italics supplied.) 49 Vt. 370, 24 Am. Rep. p. 146.

In *Miltimore* v. *Chicago & Northwestern Ry. Co.,* 37 Wis. 190, 195, 196, cited in Hutchinson on Carriers, *supra,* we find the following in the opinion of the court: "The company received the property for transportation, loaded and secured as the plaintiffs saw fit to load and secure it, and why should negligence be imputed to it for not taking precautions to guard against the plaintiffs' want of care? It is said that the company was exceedingly careless and negligent in attempting to carry this covered wagon at the time and in the manner in which it did, without making any effort to attach the same more firmly to the car. But the obvious answer to this argument is, that the plaintiffs themselves assumed the risk and responsibility of loading and securing the wagon, and the company was not called upon to see that they had properly performed their duty in that regard."

The cases cited *ubi supra* clearly rest upon the broad proposition that shippers may assume the risk of responsibility of loading and securing their property in the car of the common carrier, and that when such is the case, the defendant carrier is not called upon to "see that they had properly performed their duty in that respect," or "held responsible for the inadequacy of that which the plaintiff adjudged or did." Some authorities go so far as to hold that the carrier is not liable for loss or injury due to improper loading, even when such defective loading is open and obvious, or when it knows, or in the exercise of ordinary care could have known, of the shipper's negligence in this respect. On the other hand, other authorities hold

7

that "the carrier being entitled to reject defectively packed goods, tendered for shipment, if it accepts for transportation goods which it knows are defectively packed, or which by the exercise of reasonable care, it could have observed were defectively packed, it assumes to carry the goods as they are, and its common law liability as a carrier attaches, and it is subject to all of the liabilities usually attaching to an ordinary shipment of the same character." To this effect see also, 4 R. C. L., sec. 203.

It is the contention of the defendant in error (plaintiff below) that it was the legal duty of the defendant to inspect the car which was delivered to him by Smith and Hicks with the door unlocked; that "she had no knowledge whether the defendant was accustomed to make inspection in such cases, and it was immaterial whether she had such knowledge or not;" "that even if she had been aware that it was not the custom of the defendant to inspect cars when loaded by the shipper, such knowledge would not relieve the carrier of the duty of inspection, if that duty was imposed by law."

We have been cited to two cases expressly relied upon to support the contention that under the circumstances appearing in the instant case, the defendant was bound to inspect, and therefore was charged with the knowledge that such inspection, properly made, would have afforded. The first case is that of *Hannibal Railroad* v. *Swift,* 12 Wall 262, 20 L. Ed. 423, and the other that of *McCarthy* v. *L. & N. R. R. Co.,* 102 Ala. 193, 14 So. 370, 48 Am. St. Rep. 29. These cases are readily distinguished, in respect of the facts appearing in same, from the case in judgment.

In the *Hannibal Railroad Case,* the car containing the goods of the plaintiff took fire from an unknown cause in the course of transportation, and was totally consumed with its contents. This occurred during the Civil War. When the plaintiff applied to the railway company for

transportation for himself, family, troops and luggage, he was advised that hazardous conditions prevailed in the communities through which the railroad operated.    He insisted, however, upon his demand, and the company furnished the transportation including a car for the luggage, equipment, munitions, etc.    This car was loaded by the commanding officer, locked and turned over to the railway company.    Later, as stated *supra,* it caught fire and was destroyed.    There was no question of negligent loading involved.    In the argument for the defendants in error it is said: "No question of negligence in the matter of loading the car can arise here, as the agreed case expressly finds that the car took fire 'from some cause unknown.' " 12 Wall p. 268, 20 L. Ed. 423. The company undertook the carriage of the men and property, without compulsion, and the precise question presented was whether, under the circumstances, it was liable under common law principles as an insurer.    The court propounded *that very query* in its statement of the issues to be decided, as follows: "Upon the facts stated in the agreed case, was the railroad company liable as a common carrier for the safe conveyance of the baggage and other property of the plaintiff?" The court held that the liability of the company attached when it took possession as follows: "In all such cases the liability of the common carrier attaches when the property passes with his assent into his possession, and is not affected by the car in which it is transported, or the manner in which the car is loaded."

The court maintained in the *Hannibal Case* the broad proposition that having accepted the goods for transportation, the carrier was responsible as an insurer for supervening accidents occurring during transportation.    The question of loading in that case was immaterial, since it was not contended that the fire was due to, or in any wise related to the loading.    Hence, this case did not fall within the exception that a carrier is not liable for losses caused

by the act of the owner of the goods, and does not present
or turn upon the question in issue in the instant case. It
is true that the court, in the case *supra,* uses this language:
"The common carrier is regarded as an insurer of the prop-
erty carried, and upon him the duty rests to see that the
packing and conveyance are such as to secure its safety."
This statement is relied upon to support the contention that
in the instant case it was the duty of the defendant to in-
spect the car which it received from Smith and Hicks, and
to ascertain by such inspection whether it was properly
loaded. But as the question of loading in relation to the
accident—that is, the destruction of the car by fire—was
not before the court, and it was not contended that the
manner of loading and the persons doing the loading, had
any casual relation to the fire, the language with respect
to the duty of a carrier "to see that the packing and con-
veyance are such as to secure the safety of the property
carried," if relied upon to support the general proposition
that even when the owner loads a car, the carrier must in-
spect that loading and ascertain that it has been properly
done, is *obiter dictum.*

In the *McCarthy Case* the plaintiffs loaded four cars with
terra cotta tile, and delivered same to the railroad company.
The tile reached Birmingham in a very damaged condition.
A suit for damages was brought against the company. The
defense relied upon was that the shipper had insufficiently
and inadequately loaded the cars. In reply, the plaintiff
insisted that the carrier had failed to show affirmatively
that it was free from fault, and that in any event the in-
sufficient loading was discernible on an ordinary examina-
tion, and that, under the circumstances, the carrier was
bound to inspect, and that failing in this, and having ac-
cepted the shipment, it was charged with the usual liability
of an insurer. In this case the goods were undoubtedly de-
livered to the carrier in good condition. The court, in part,

said: "It is manifest that the case made by the averment of these facts tendered no issue of negligence *vel non* on the part of the defendant. The contract averred is an unconditional common law contract of carriage, without reservations, or exceptions. By its terms the defendant insured the safe delivery of the goods to the consignee, and assumed liability for any loss, or injury, resulting from any cause, except such as afforded the carrier a defense at common law. The strictest proof of all possible care on the part of the carrier in the transportation and delivery of the goods would have been no defense, and of course proof of the carrier's negligence was in no wise essential to a recovery. The defenses which a carrier under such a contract may interpose to deliver in good condition, are commonly mentioned as two only, namely, that the loss or injury was due either to the act of God, or to the act of a public enemy. But there is in reality a third resting on the fault of the owner of the goods or his agent. * * * The carrier is liable * * * for any loss, or injury, due to the concurring and contributory negligence of himself and the shipper; hence, when he relies upon the exception to the rule of liability which rests upon the fault of the shipper, he must bring himself entirely and perfectly within it by negativing all contributory fault of his own." 102 Ala. 199, 200, 201 and 202, 14 So. 371, 372, 48 Am. St. Rep. 29, and authorities cited.

This extract embodies sound principles of law generally stated. But looking to the opinion of the court for the disposition of the case under the situation presented by the pleadings, it will be seen that the court concluded that the defendant had failed in respect both of "averment and proof to bring itself within the exception under which it attempted to shield itself from liability." While some of the evidence tended to show that the goods had been improperly and negligently loaded, by the shipper, the court

construed the pleas setting up the defense to mean, in effect, that, though the defendant carrier was guilty of negligence in the matter of transportation, it was absolved from liability for such negligence by reason of the fact that "its negligence was aided to the damnifying result, was contributed to, by the concurring negligence of the plaintiffs." Says the court: "These averments, in short, were admissions of negligence on the part of the pleader, coupled with charges of negligence on the part of the plaintiffs. The further averments of these pleas, that the cars were closed when they were received by the defendant from the first carrier, so that the condition of their contents was not visible, and that defendant and its agents did not then know that said cars were improperly loaded, if intended to negative all negligence on the part of the defendant, are repugnant to and inconsistent with the admissions of defendant's negligence implied in the allegation that plaintiffs' negligence contributed to the injury. On the other hand, if these further averments are not to be taken as negativing all negligence imputable to defendant, and that is probably the true construction of them, the pleas are yet bad, for, as a carrier is liable for loss or injury resulting from the act of God aided by his own negligence, or from the act of a public enemy to which his own fault contributed, so he is liable for any loss or injury which is due to the concurring and contributory negligence of himself and the shipper; * * *." *McCarthy* v. *Louisville, etc., R. R. Co.*, 102 Ala. 193, 14 So. 370, 48 Am. St. Rep. 29.

It is easy to extract from this citation the foundations of the court's finding. In one view, the pleas undertook to negative negligence on the part of the carrier, but if so intended, they were inconsistent with the implications of negligence on its part carried by the allegation that the plaintiffs' negligence contributed to the injury. If an injury is due to negligence, and the negligence of one party contrib-

utes to the injury, of necessity the remaining portion, or residuum, of negligence is the negligence of the other party, in the case cited the defendant carrier. In the other view, the pleas did not negative all negligence imputable to the defendant. This would carry an admission of negligence on the part of the defendant. In either view, under the interpretation placed by the court upon the pleas, the defendant would be liable.

But the defense in the instant case is that the unaided and uncontributed-to negligence of the shipper, in the matter of shipping and packing, was the efficient cause of the injury, the defendant claiming to have used due care in handling the shipment. The court admits in the case *supra* that, conceding such a state of facts, the defendant would not be liable. For instance, in 102 Ala. on p. 202, 14 So. on p. 372, 48 Am. St. Rep. on p. 34, we find the following: "The *unaided, uncontributed-to negligence of the plaintiff producing the injury is a defense,* but where there is negligence also on the part of the defendant, without which, notwithstanding plaintiff's fault, the injury would not have happened, this fault of the defendant neutralizes and eviscerates the negligence of the plaintiff, as a ground of defense." (Italics supplied).

Plainly, in that case, the defendant did not state a case in his pleas which brought it within the exception upon which it sought to rely, nor did the bill of lading provide that the shipper having undertaken to load and count his packages, the carrier disclaimed responsibility for the number and condition of same.

The conclusion of the court in the case *ubi supra* was that the evidence "afforded an inference, or rather room for an inference, that the goods were negligently packed, and that but for this fault the injury would not have occurred. But even if the jury had found in line with this tendency of the evidence, and deduced the conclusion that the

plaintiffs were at fault, and that such had a causal connection with the injury, it was yet their duty to indulge the presumption that the defendant was also negligent in and about the transportation of the goods, and that this negligence aided plaintiff's negligence to the result complained of, there being no *evidence on the part of the defendant upon whom the burden rested in this regard, nor indeed any averment to the contrary.*" (Italics supplied.) We do not consider that this case establishes the contention that the defendant, as a matter of law, was bound to inspect the contents of the car in question upon delivery of same.

[2] This case does hold, however, and very properly, that even when there is evidence tending to show that the goods were not properly packed by the shipper, and they arrive at their destination in a damaged condition, but the defendant neither avers, nor furnishes evidence, that it was free of negligence, there is a presumption that there was sufficient negligence in the course of transportation to justify a verdict for the plaintiff. The facts with respect to the delivery of the car in the instant case are that when Otto, acting for Smith and Hicks, had completed the operation of loading, he turned it over to the yard man, and told him to receive it. The following questions and answers are taken from Otto's testimony:

"Q. Did he inspect it, after you packed it?

"A. We left the door open so that he could look in.

"Q. Did he look in?

"A. I suppose he did. We turned it over to him.

"Q. And he accepted it with the door open?

"A. Yes, sir.

"Q. And then sealed it?

"A. Yes, sir, the door was partly open.

## *Cross-Examination.*

"Q. Did you see him seal it up?

"A. Saw him going towards that car. He was sealing other cars, going right along sealing cars up.

"Q. You realized though that you were shipping a car as a carload shipment, the shipper being responsible for the proper loading of the car, didn't you?

"A. Yes, sir."

The car was described as a "clean, closed car, no defect in the car."

In the matter of loading it appears that the ends of the car were loaded. As the shipment was not sufficient to fill the car, the middle space, where the doors are placed, was vacant.

"By Mr. Scott:

"Q. Leaving the middle vacant, so that you can get at it?

"A. Yes, sir."

[3] This witness does not state that the defendant inspected this car, or that he ever saw a car inspected that he had packed, or that it was the practice of the company to make inspection of cars packed by shippers. The nearest approach to a positive statement in this respect is the following answer of the witness: "I knew it would not be sealed, if it was not properly packed."

The other parties engaged in the operation of packing do not testify in regard to inspection, but the plaintiff undertook to prove by one Louis Werner, Jr., a foreman of the Chesapeake and Ohio Railway Company, the general usage, in the matter of inspection, common to railroads in the city of Richmond.

*Testimony of Louis Werner.*

"By Mr. Scott:

"Q. When you accept shipments, are you supposed to inspect the cars?

"A. Yes, sir, to see whether they are properly loaded.

"Q. If you find it not properly loaded, do you make objection?

"A. Yes, sir, you refuse to sign the bill, if it is not properly loaded."

On cross-examination, this witness made the following statements:

"Q. All in the world that you know about this thing is just what you observed there in working for the Chesapeake and Ohio?

"A. That is all.

"Q. You know nothing about the practice of the Richmond, Fredericksburg and Potomac?

"A. I don't know about their practice, but that is the way we are all supposed to do. *I never worked with them.*" (Italics supplied.)

"Q. You never worked for the Seaboard?

"A. No, sir.

"Q. You don't know what they do?

"A. No, sir.

"Q. You haven't worked with the Coast Line?

"A. No, sir.

"Q. You don't know what they do, of your own knowledge?

"A. No, sir.

"Q. Your experience is entirely limited to the Chesapeake and Ohio and what you are supposed to do?

"A. Yes, sir."

It is manifest from the testimony of this witness that he was not qualified to testify as to the practice of the Rich-

mond, Fredericksburg and Potomac in the matter of inspection, and his evidence in that regard has no probative value.

Leslie Ellis, freight agent for the Richmond, Fredericksburg and Potomac in the city of Richmond, was a witness for the defendant. He states that on application he placed a car for Smith and Hicks to load; that having loaded it, they brought the bill of lading to him to sign; that he thereupon had the car sealed and weighed. Further, in respect of inspection, he testified as follows:

"Q. What is the practice in regard to sealing a car, or any possible inspection, where the shipment is carload shipment?

"A. As soon as this car was reported loaded by Smith and Hicks, we had it sealed; but we don't inspect carloads. They are loaded on private sidings, in various yards miles away from us, and we have nothing to do with what he puts in there.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. Had Smith and Hicks been in the custom, or in the habit of loading cars at your yards?

"A. Yes, sir, they loaded quite a number.

"Q. In any other cases have there been inspections?

"A. No, sir, never has been any inspections at all.

"Q. Did they know that?

"A. They knew it. I suppose so. We have never given them any reason to think that we inspected them. We put a car, and they load it, and we seal and forward it. \*   \*   \* All that is done with carloads, we give a man a car, and he loads to suit himself. We receipt for it: 'Shipper's loading and accounting, and railroad company not responsible for the number or condition of packages.' "

[4] It is very clear from the testimony in this record that it was not the practice of the Richmond, Fredericksburg and Potomac Railroad Company to make inspections of carloads loaded by shippers, nor was there any reason why they should do so, having in mind that the

cars are placed for the convenience of the shipper, and he undertakes the task of loading. If he is negligent in that respect, he should be responsible for the consequences of his own acts. Quite a different question would be raised if the improper loading was manifest to ordinary observation when the car was received. But such is not the situation in the case in judgment.

[5] The car was an ordinary box car, with the furniture and other goods in the ends. It is stated that the door was open, but the extent of the opening is not given. It is not stated that the door was pushed back, so that the sealer, as he walked by the car, could see into the interior. It is true that if the door was not locked, the sealer could have pushed it back, climbed into the car, and inspected the contents. But it was not incumbent upon him to do this, and there is certainly no evidence to show, or even tending to show, that as the yard man discharged his task of sealing the car, the insufficiency of the packing was manifest to him, in the exercise of ordinary observation.

Coming now to the question of packing, loading and transportation, the plaintiff alleges, as stated *supra*, that Smith and Hicks agreed to pack, crate, transfer, haul, load and ship all of her effects, but that so far from doing so, said Smith and Hicks did not properly load, pack, crate and ship said effects, and the defendant negligently transported same, the concurring negligence resulting in grievous damage to plaintiff's property. Such are the averments of her declaration. But the evidence submitted by the plaintiff is highly conflicting on the questions of crating, packing and loading. She testifies in person, and submits letters tending to show that Smith and Hicks were to crate the mirrors, pictures and china press, pack four barrels of china and silverware, and wrap and pack the furniture securely in the car, but her other witnesses who testify as to the contract, said witnesses being the agents of Smith

and Hicks, are in sharp conflict with the plaintiff. These witnesses—at least some of them—deny that it was agreed on the part of said Smith and Hicks to wrap the furniture. It is admitted that no wrapping was done. Further, they do not sustain the plaintiff's averments, or agree with the plaintiff's statements, that the furniture was insufficiently and inadequately loaded. On the contrary, they positively state that the loading was properly and efficiently done. It will be necessary to go somewhat into detail in respect of this matter of loading and packing.

The evidence relied upon to sustain the plaintiff's averment of negligence in this respect is the state of the contents when the car arrived at its destination, and the lack of packing material in the car. The witnesses who testify in this regard are the plaintiff, Ellis Evans, an expressman in Atlantic City, engaged to unload the car, and William Graham, an employee of Evans. The testimony of these witnesses is clear, specific, coherent and consistent. Evans and Graham are entirely without interest in the premises, since whatever the result of this litigation no liability can attach to Graham or his employer, Evans. Both Evans and Graham have had years of experience in the moving and transfer business, and were qualified to speak as to the proper method of loading furniture for shipment by railway car. As soon as the car was opened, and the condition of its contents revealed, Graham took two pieces to the plaintiff's house, and asked her to come down to look over the state of her effects. This she did at once, meeting Mr. Evans at the car. She states that she found "an old mahogany framed mirror, lying face up on the floor, and handsome books scattered all over the car; a handsome mahogany chest of drawers with the cloth (?) broken off; victrola records scattered around and broken up; lamps and kitchen utensils in general confusion, a lamp shade with the leg of a chair sticking through it; two dressers had been over-

turned, and neither one had had even the mirror taken off; the small Persian rugs had evidently been used for packing." The witness picked up a man's hatful of little pieces that had been broken off the furniture, "such as knobs, and the toes of claw-feet, and little pieces like that." This witness testified as follows as to the material suitable for bracing that was found in the car when the seal was broken in Atlantic City:

"Q. Did you see any bracing whatever in that car?

"A. No, I saw two boards I should say as wide as my hand, that were lying loose in the car. Now whether or not they were meant for bracing I do not know, but absolutely that was the only thing that could have been bracing in the car.

"Q They were about the width of your hand?

"A. Yes.

"Q. About how thick?

"A. I should say half an inch.

"Q. There were just two of those?

"A. Yes.

"Q. How long were they?

"A. Maybe six feet."

Speaking of a velvet upholstered mahogany claw-foot davenport, the witness states that evidently a heavy piece of furniture had been on the davenport, and the upholstery was practically ruined, and the frame badly scratched, so that it had to be entirely done over. A chest of drawers had three legs off, and most of the knobs, with the top badly scratched. The only packing that she saw was a little loose excelsior in the car, a small market basketful, and her small Persian rugs. Great pieces were split off the top of a cedar chest, and the kitchen table was split in half. The kitchen utensils were mashed and battered.

The testimony of Evans and Graham fully confirms that

of Mrs. Buchanan as to the condition of the contents of the
car, and describes in full and convincing detail the utter in-
adequacy of the material found in said car for properly
bracing and packing the furniture.

### Examination of Ellis H. Evans.

"Q. When you got to the car, what was the condition you
found?

"A. Well, the furniture was in very bad shape for a car-
load movement. Of course, to describe in detail, there were
pieces broken off of almost everything. It was chipped, and
it was strewn over the floor of the car.

"Q. Did you find any bracing at all in the car?

"A. No, there was no indication. The only indication of
packing was a small quantity of excelsior, and a few pieces
of board which in my opinion wouldn't be sufficient to
brace, or pack, a carload at all of that quantity of goods.

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*

"Q. How should that furniture have been packed, or
prepared for shipment properly?

"A. Well, the furniture should have been wrapped with
heavy paper or newspaper in the first place. It should then
have been placed in the ends of the car and the heavy
furniture on the bottom and the lighter furniture piled on
top with excelsior between them. After the end of the car
was filled, is should have been braced with heavy enough
lumber to guarantee it arriving with ordinary care in the
freight movement.

"Q. Did you find a single piece of bracing intact and in
proper place when you opened the car?

"A. Nothing at all in place to indicate that there was
any packing done in the car.

"Q. How many pieces of lumber did you find in the car?

"A. Well, I can't tell you offhand now, Mr. Moore, but

my recollection is that there were about four pieces of lumber that I kicked out into the yard.

"Q. Did you have to unfasten these pieces?

"A. No, they were on the floor of the car.

"Q. About what size were they?

"A. Well, I should judge it was about seven-eighths lumber. What we call roofers here.

"Q. You mean about seven-eighths of an inch thick?

"A. Yes.

"Q. About how wide?

"A. Six inches, I think, that lumber runs.

"Q. How long?

"A. Well, they were not over five feet in length, I think, any of them.

*   *   *   *   *   *   *   *   *   *

"Q. Did there appear to be any orderly arrangement of the furniture?

"A. None whatever. There was no semblance of a packing job in that car, to my idea of the way furniture of that description should have been packed.

"Q. If all of the excelsior, and all of the lumber, that is those four pieces to which you refer, had been used to properly pack or crate, some of the furniture, how much could have been properly prepared, or crated, for shipment with the amount of excelsior and the pieces of lumber that were in the car?

"A. Well, there couldn't be any more than one piece. In fact there was not enough lumber to create any one piece that I recognized, unless possibly a light chair.

"Q. Was there a single piece of furniture crated at all?

"A. No, I don't recall any one crated in the car. *   *   * I would say that the way it was put in there, none of it could arrive safely.

"Q. How were the mirrors arranged?

"A. I recollect two or three of them attached to the pieces

of furniture on which they belonged.  *  *  * The books were strewn over the floor of the car, with no pretense at packing at all.

*Cross-Examination.*

*          *          *          *          *          *          *          *          *          *

"Q. Haven't you seen cars of furniture which have been properly packed, smashed and broken by rough handling?

"A. Not to the extent that this car was; never.

"Q. Have you not seen carloads of furniture badly damaged by rough handling by the railroads?

"A. Well, I have seen pieces badly damaged, but not carloads. Of course I don't know what—I naturally know that you are interested in another side of it. It was a mighty bad looking car when I got into it for anybody to pretend to say they had packed. I am saying that without feeling in the matter at all.

*William Graham.*

"Q. What did you find, William, when you broke the seal of the car?

"A. The first thing I found was furniture piled—I guess it was the first thing I found. Furniture scattered all over the car and propped against one another.

"Q. When you opened the door, did you see any mirrors?

"A. Yes, sir, laying all over the floor.

*          *          *          *          *          *          *          *          *          *

"Q. Did you ever see a car packed like that one?

"A. No, sir, I never did. Never seen a car packed like that before.

"Q. How was that furniture packed?

"A. It weren't packed at all, in my estimation, like I have seen cars packed that I have unloaded.

"Q. How is a car usually packed when it is packed right?

8

"A. Packed right, the heavy stuff is generally put at the bottom and the light stuff on top, and then braced with the chairs on top; of course, it has got to be well packed with excelsior, or something, or burlap.

"Q. How ought it to be braced?

"A. After you have stacked the furniture, you have naturally got to brace it with lumber to keep it from shaking.

"Q. Ought that to be light or heavy lumber?

"A. Heavy lumber, always.

"Q. Was there any such heavy lumber in that car?

"A. I didn't notice any at all.

"Q. Would you have seen it, if it was there?

"A. Sure. We *would have had to break it loose.* (Italics supplied.)

"Q. Did you have to break loose any piece of lumber at all?

"A. No, sir.

"Q. Was there any piece of lumber fastened to the car at all?

"A. I didn't notice any at all. * * * I don't think the car had been in any accident. I think it was the packing that caused the damage to the furniture, the way it was packed."

The testimony of the witnesses for the plaintiff who did the actual loading and packing of her furniture is to the effect that it was properly done. These witnesses are Alfred Otto, Arthur Otto, London Chandler and Garland Evans, all employees of Smith and Hicks.

The testimony of Alfred Otto is in part that "the furniture was braced in the car as securely as any car he ever packed;" that he used a sufficient amount of excelsior, "a bale and a half;" that he used a sufficient amount of lumber to properly brace the furniture as packed; that he crated and packed everything as per agreement; that Chandler Evans and his son Arthur helped him; that he had the stuff placed as he wanted it.

*Cross-Examination.*

"Q. How many pieces of lumber did you use?

"A. Well, I will not say positively how many pieces I used, but I used enough lumber to brace the car as far as I saw it was necessary.

"Q. You have some idea of how many pieces you used?

"A. I may have used—

"Q. Two or three?

"A. Two doesn't start. It may be for half of one side of the car.

"Q. You think two would be enough for one side of the car?

"A. No, sir, two wouldn't have started it.

"Q. How many did you use?

"A. About eight or nine sixteen-foot strips.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

"Q. You testified a moment ago that you did not recall as to the number of strips used. When you say that there were probably eight or nine, you simply mean that was about the number that should have been used?

"A. I didn't say it should have been used. If it should have been used, I used it. I mean to say if I thought it was right to use ten pieces, I would use ten, and wouldn't use eight or nine. If I thought twelve ought to be used, I would use twelve pieces.

"Q. But you have no distinct recollection as to what you did on this occasion?

"A. No, sir, with the exception of that excelsior. I do know what I had of the excelsior.

"Q. But you have no distinct recollection as to the amount of lumber?

"A. No, sir.

"Q. How much was the amount of the excelsior?

"A. About 165 or 170 lbs.   *   *   *   I used half a bale out of the car, and a bale and a half on the car.

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*

"Q. Did you say the mirrors on all bureaus were taken off?

"A. Yes, sir.

"Q. You remember each one?

"A. I remember distinctly.  I have been in the business ten years and never yet handled a bureau, or washstand, I didn't have the mirrors taken off."

*Examination of Arthur Otto.*

This witness states that in his opinion the car was packed "the same as they generally packed a car, and braced the same way, with particular care," and there was enough excelsior used, and enough lumber used to properly pack and this witness:

The following extracts are from the cross-examination of brace the car.   .

"Q. You don't recall anything particularly what you did?

"A. I couldn't tell you anything particular that I did.

"Q. You just remember that was one job you worked on?

"A. Just one job I worked on.

"Q. I reckon you have worked on hundreds since then?

"A. I have worked on a plenty of jobs since that time."

London Chandler states that the car in question was packed and braced to go anywhere *except in a wreck.* (Italics supplied.)  On cross-examination witness stated that he saw the lumber used—could not say how much— but enough to brace a car.  He did not participate in the actual packing, but "stood on the truck and handed the stuff

off." On direct examination witness stated that the car was braced like all other cars are braced that he had seen. He had seen a great number of cars packed and braced.

Garland Evans, who had also loaded a great many cars, helped load this one. He stated that "it was packed properly, so far as he could see, unless it was in a wreck, that it was well braced and well packed"—that in the time since he had helped load this car (about 12 months prior), he had loaded a great many others, too many to remember.

The testimony of the witnesses who speak as to the loading of the car, and that of the witnesses who speak as to the condition of the contents of the car at the place of destination, cannot possibly both be true, and the statements of the former are wholly irreconcilable with the averments of plaintiff's declaration. The physical facts refute the testimony of Otto and his associates, who are put on the stand as the witnesses of the plaintiff, but who are in fact the employees of another party, to-wit, Smith and Hicks. It is to the interest of the later to discredit plaintiff's allegation that the goods were improperly packed and insufficiently braced. In the judgment of the foregoing employees of Smith and Hicks, the packing was of the highest order of excellence, one of them testifying that the car "was packed and braced to go anywhere, except in a wreck." But as there was no wreck, the internal condition of the car on arrival refutes this confident statement.

Otto, Sr., repudiates, almost with indignation, the suggestion that he used only two or three strips of roofers to brace the furniture in the car. He states that "two wouldn't start," and that he used eight or nine sixteen-foot strips, also 165 or 170 lbs. of excelsior. If this bracing and packing material had been found in the car when the seals were broken in Atlantic City, the witness' statements would have been corroborated, and the inference would have been strong that the battered condition of the furniture was due to

extraordinary jolts and jars received in the course of the
trip, which loosened the bracing, and allowed the furniture
to move forward and backward; that is to say, longitudi-
nally in the car.  Having in mind the number and variety
of pieces of furniture in the car, and that same was only
about two-thirds full, it requires no expert knowledge to
reach the conclusion that four pieces of narrow roofers, as
described by the witness, Evans, were totally insufficient for
adequate bracing.  If sufficient bracing and packing mate-
rial, that is to say if eight or nine sixteen-foot strips and
165 or 170 pounds of excelsior had been really used, as
claimed, how is it to be explained that they disappeared
in the course of a comparatively short trip in a closed and
sealed car?  The circumstances were such as to impress in-
delibly upon the minds of the only disinterested witnesses,
Evans and Graham, that there was an almost total lack of
packing material in the car when the doors were opened.
A witness who loads many cars in the course of a year may
well be at fault when, looking backwards, he seeks to call to
mind in self-justification precisely what he did in one of
many jobs.

[6] Confronted with such a scene of confusion and disor-
der as was revealed when the seals of the car in question
were broken in Atlantic City, the experts who had been em-
ployed to unload a presumably well-packed car would natu-
rally be on the lookout for the efficient cause of this pitiful
wreckage of costly furniture. If that cause, upon inspection,
was ascertained to be insufficient bracing and packing, as
evidenced by an almost entire absence of appropriate mate-
rial for such bracing and packing, that lack of material would
be a fact forcibly implanted in the memories of the wit-
nesses.  The witness, Evans, noted about "four pieces of
lumber seven-eighths of an inch thick, six inches wide and
about five feet long," on the floor of the car, and "a small
quantity of excelsior."  One hundred and sixty-five pounds

of the latter material, relieved from pressure, would make a very large pile, and if used as alleged would have been instantly noticeable upon the most casual inspection of the car. Otto, Sr., states as a positive fact that the mirrors on all the bureaus were taken off. On this point his associate workers do not testify. Evans, Mrs. Buchanan and Graham all concur in stating that when the car arrived several of the mirrors were "attached to the pieces to which they belonged." This piece of negligence would make an ineffaceable impression on Evans, for the reason stated by him, namely, that "they should not have been moved out of the house in that fashion, let alone shipped." Otto's statement that the mirrors were all removed is most overwhelmingly refuted. The testimony of the witnesses in this case fairly scrutinized with reference to the apparent probabilities and improbabilities of their respective stories, plainly shows that Smith and Hicks were guilty of gross negligence in loading the car. The physical facts establish plaintiff's contention that the furniture was not properly packed when it left Richmond. It is plain to us upon the evidence that the furniture was not properly loaded and braced, and that if the railway company subsequently handled the shipment with the care appropriate to a properly loaded car, then the injury to its contents is traceable exclusively to the negligence of the plaintiff's agents in the discharge of the task of packing and loading.

[7] Hence, one question only remains for disposition, and that is, whether the railway company exercised proper care in transportation. It is clear that the car was delivered to the plaintiff in good condition, and while no special inspection of same was made in Atlantic City, it is reasonably apparent that if the car had shown any external signs of injuries received in transit, they would have been manifest to Evans and Graham when they set about the task of unloading. So far from noticing anything of the sort, Graham testi-

fies, as recited *supra*, that "he didn't think the car had been in an accident." "I think," he said, "that it was the packing that caused the damage to the furniture, the way it was packed." A certain amount of shocks and bumps are necessarily incident to and attendant upon the movement of freight trains, and the purpose in view in packing and bracing the contents of a freight car is to make said contents capable of withstanding these inevitable shocks. Furniture packed as the furniture in question was packed was not prepared for the ordeal of an ordinary freight movement, involving many starts, stops and shiftings.

The query in the instant case at this point is whether the defendant, in view of the damaged condition of the contents of the car on arrival, has negatived the presumption that the car was handled in the course of transit under conditions of needless and excessive jolts and jars. On this point the defendant submits the testimony of six witnesses concerned with the movements of the car from the beginning to the termination of the trip. The time taken for the trip is immaterial, since the shipper was advised that owing to unusual conditions prevailing over the lines of the carriers concerned, the shipment was subject to delay. Heavy movements of troops destined for trans-shipment were in progress. The car was moved in accordance with regularly arranged freight service, and having in mind the intervals when it was at rest, about eight days elapsed before Atlantic City was reached. The actual running time required was much less.

The first witness in this connection was Yowell, yard conductor for the Richmond, Fredericksburg and Potomac Railroad in Richmond. He moved the car from the ball park to Acca, as conductor in charge of the movement. He reached Acca about six A. M. September 11, 1918. Nothing unusual happened on the trip. He left the car on what is known as the "no-bill" track. He is specific that no "rough handling" took place while the car was under

his control. From the time that the car was picked up at the park until it was left on the "no-bill" track at Acca, there was no other conductor in charge. During most of this period the car was at rest. The next witness in order is W. R. Utley, a yard conductor for the Richmond, Fredericksburg and Potomac. He weighed the car at Acca.

"Q. Was there any accident, or anything unusual, in connection with this car on that occasion?

"A. Not while in my charge."

It would have been the witness' duty to report any rough handling, breaking or accident while the car was in his charge.

M. T. Cummins, a yard conductor of the Richmond, Fredericksburg and Potomac, follows Utley on the stand. He "lined the car up on September 14th to go North," finding it on the no-bill track.

"Q. Was there any accident, or anything unusual in handling the car?

"A. No, sir, if there had been, I couldn't have lined it up.

*Cross-Examination.*

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

"By Mr. Moore:   Q. If there had been any accident or anything out of the ordinary, would you have been required to make a report?

"A. I would.

"Q. Did you have to make a report?

"A. I did not."

The next witness called in order was the yardmaster of the freight yards of the Richmond, Fredericksburg and Potomac in Richmond, J. W. Hall. He had charge of all freight movements on the yard. The witness states that his records do not show that there was anything wrong

with the car in question, and the movement of troop trains held the car in Richmond. He "ordered the crew to take the car to Potomac Yards," and his records show that there was no accident, or unusual occurrence on that trip.

L. W. Gills, the conductor, who took the car to Potomac Yards, was next called. This witness was a conductor of long experience in the service of the railway company. He stated that the car containing the furniture was in a favorable place on his train "from the standpoint of jarring." This car was the third car from the engine. Conductor Gills took out the train containing the car in question on the morning of September 14th, reaching Potomac Yards about 2:51 P. M. of the same day. He testifies that the time of movement was "about normal," and that the car did not get any rough handling while in his charge—that it was not in any accident—and that it was left in Washington "in the track that we turn our freight trains on over to the Potomac Transfer, in good condition without exception."

W. H. Charles, the witness next in order, was the "assistant yardmaster of northbound Potomac Yards." He gave the record of the car in question as follows: "Arrived in Potomac Yards 2:51 P. M. September 14, 1918, in charge of Conductor Gills, delivered to Pennsylvania Railroad 4:20 P. M., and leaving on the Pennsylvania train 9:55 A. M. September 15th.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. Was there any accident, or rough handling, as far as your records show, of that car during that time?

"A. Before I came here I examined our records, and could find no record of that car being in any accident. Our records do not show it, and the records of the mechanical department do not show anything the matter with it.

"Q. If there had been, would the records show it?

"A. Yes, sir, and it would even show if they made any slight repairs. There is no record of any slight repairs even."

The foregoing witnesses testified orally. In addition the defendant submitted the depositions of W. W. Thrift and others.

Thrift deposed that he was in 1918 in the service of the Philadelphia, Baltimore and Washington Railroad Company, and that it was his duty to take charge of trains from Potomac Yards between Alexandria and Washington, and have charge of such trains until delivered to the next connecting conductor at Edgemoore Yard, Delaware; that he made a record from personal observation of the cars in the trains that he moved on September 15, 1918; that the fourth car in his train from the engine was the car in question; that he left it at 6:06 P. M. of September 15th; that the movement was a good one, and that there was no rough handling of that train in the course of said movement.

Knotts, the next witness, deposes that he was a freight conductor of the P. B. & W. R. R. Co., and moved trains from Edgemoore to Pavonia Yards, N. J.; that he moved a train containing the car in question on September 15th (evidently 16th) from Edgemoore to Pavonia Yards; that the movement was an "ordinary, good movement," and that there was no rough handling of the train while same was in his charge.

W. G. Long deposes that he was an extra freight conductor of the West Jersey and Seashore Railroad, and moved trains from Pavonia Yards to City Line Sidings, outside of Camden, New Jersey; that on September 17th he moved the car in question, and delivered it at City Lines; that there was no rough handling of the train while in his hands.

Benjamin H. Campbell deposed that he was an extra freight conductor on September 18, 1918, on West Jersey and Seashore Railroad; that it was his duty to take trains from City Lines to Atlantic City; that he moved the car in question on the 18th; that he had a passenger engine, and

a very easy handling of the train; that he had a good movement, and delivered the car at Atlantic City at 9:31 P. M. on the above day.

W. R. Brown, supervisor of arranged freight service on the Pennsylvania System, east of Pittsburg, testifies that the record of the movement of the car in question from Potomac Yards to Atlantic City was the "regular, arranged freight movement for a shipment of merchandise such as furniture."

The testimony of the foregoing witnesses, giving in detail the movement and location of the car containing Mrs. Buchanan's furniture from the time of reception of same in Richmond, to date of delivery in Atlantic City, shows very clearly that nothing happened en route to cause injury to a properly packed car. It negatives satisfactorily the presumption of negligence of handling in the course of transportation. We are fully satisfied after a careful consideration of the evidence in this record that it was error in the trial court to hold that the damage to the goods in question was caused by the negligence of the defendant. It was evidently due to the negligence of Smith and Hicks in the matter of loading and packing.

For the reasons heretofore given, we are satisfied that the judgment complained of was plainly against the evidence, and the same should be reversed. The proper order will be entered in this court.

*Reversed.*