**BOH BROS. CONST. CO. v. PERRY HEAVY HAULERS.**

Civil Action No. 1056.

District Court, E. D. Louisiana.
New Orleans Division.
May 31, 1947.

Charles F. Fletchinger, of New Orleans, La., for plaintiff.

Lemle, Moreno & Lemle, Arthur A. Moreno, and Selim B. Lemle, all of New Orleans, La., for defendant.

BORAH, District Judge.

This action arises under part II of the Interstate Commerce Act, 49 U.S.C.A. §§ 301–307, to which Section 20(11) of part I of the Interstate Commerce Act is made applicable, 49 U.S.C.A. § 319, and is brought by Boh Brothers Construction Company against Frank L. Perry and T. N. Perry doing business as Perry Heavy Haulers, a common carrier by truck, for damages for its alleged negligence in the transportation of a ditching machine from Centreville, Mississippi, to Pollock, Louisiana.

The cause was tried by the court without a jury.

Plaintiff alleges that it is a co-partnership engaged in the business of general contracting; that on November 14, 1943, it engaged the services of defendant to transport a ditching machine from and to the points above mentioned for an agreed consideration, including tax, of $83.84; that no bill of lading or formal document was executed other than a memorandum or "Freight Bill"; and in respect to the specific acts of negligence on which plaintiff bases its claim for damages, it is alleged in paragraph 6 of the complaint as follows:

"While the machine was being transported by the defendants, by motor truck, en route to Pollock, Louisiana, under the agreement of carriage aforesaid, the motor truck met with an accident on Highway No. 84 in going over the river bridge at Jonesville, Louisiana. In loading the ditching machine on the truck, the plaintiff is advised, and accordingly alleges, that the machine was permitted to extend over and beyond the width of the truck, this being the part of the machine known as the conveyor. In going over the bridge the truck driver carelessly and negligently failed to give himself enough clearance so that the extended conveyor struck the rail or abutment of the bridge, which did serious and irreparable damage to certain parts of the conveyor."

These negligent acts constitute the gravamen of plaintiff's complaint. Nowhere in the complaint is it alleged that the ditching machine was in good condition when it was shipped.

The answer admits that this action arises under the Interstate Commerce Act and that the machine sustained some damage when the motor truck met with an accident, but denies that defendant was negligent in the particulars alleged or in any other respect. Further answering defendant alleges that plaintiff was required to load the machine for transportation; that the machine was loaded under the supervision of a supervisory employee of plaintiff and that when loaded no part of the machine protruded beyond the sides of the truck; that following said loading defendant's

driver advised plaintiff's superintendent that the conveyor should be secured in place by means of a chain and offered a chain which was part of the equipment of the truck for the purpose of fastening the conveyor in place, which offer was refused and the conveyor was tied in place with a grass rope which was supplied and applied by plaintiff's employees under the direction of plaintiff's superintendent. That during the course of transportation the machine was inspected on several occasions to see that it was secure but notwithstanding the care and attention given the machine by defendant's employees the grass rope holding the conveyor in place parted while crossing the bridge at Jonesville, Louisiana, and caused the conveyor to drop down and protrude beyond the side of the truck without the truck driver's knowledge with the result that the conveyor came in contact with the side of the bridge, sustaining damage. Defendant alleges that the failure of plaintiff to properly load the machine and secure the conveyor was negligence which caused or contributed to the accident and defendant pleads said negligence in bar of recovery hereunder.

The plaintiff in this case pleads specific acts of negligence on the part of the carrier, but it has offered no testimony in support of its specifications and the defendant has exculpated itself from all blame by refuting the specific acts of alleged negligence. It is the defendant's contention that having so charged specific acts of negligence on the part of the carrier as the cause of the loss for which plaintiff seeks recovery, plaintiff must recover, if at all, upon that theory. This would seem to be the law in Louisiana. Snowden v. Tremont & G. R. Co., La.App., 140 So. 122. It is apparently the law in other jurisdictions. Yontz v. Missouri Pacific R. Co., 174 Mo. 482, 160 S.W. 832; Wentworth Fruit Growers Ass'n v. American R. Exp. Co., 222 Mo.App. 1189, 1 S.W.2d 1028; American Railway Express Co. v. Cole, 185 Ark. 532, 48 S.W.2d 233; Georgia S. & F. R. Co. v. Makeever, 228 Ky. 492, 15 S.W.2d 293.

But plaintiff has tried its case as though it had not pleaded the specific negligence which caused its loss and would have the court hold that Section 20(11) of the Act, generally referred to as the Carmack Amendment, makes a common carrier an absolute insurer of goods transported by the carrier, and that the plaintiff is entitled to a judgment against the defendant upon proof that the machine was delivered to the carrier in good condition and delivered to the consignee in bad condition. This is not the law. The Carmack Amendment has not changed the common law doctrine in respect to a carrier's liability for loss occurring on its own line. Adams Express Co. v. Croninger, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314, 44 L.R.A., N.S., 257; Cincinnati & Tex. Pac. R. Co. v. Rankin, 241 U.S. 319, 36 S.Ct. 555, 60 L.Ed. 1022, L.R.A.1917A, 256; Alabama & V. R. Co. v. American Cotton Oil Co., 5 Cir., 249 F. 308. The general rule is well stated in the annotations in 81 A.L.R. 811, as follows:

"In the absence of limitation by contract, a carrier's common law liability for the safe carriage of goods is that of an insurer, except when the injury or damage to goods arises from certain excepted causes, namely, an act of God or the public enemy, the inherent nature or vice of the goods themselves, and the acts of the shipper. Within the last named exception fall such acts as the improper or faulty packing and preparation for shipment; and it may be stated as a general rule, subject to qualifications hereinafter noted, that, when the loss or injury occurs by reason of the fact that the goods have been improperly or defectively packed, the carrier is relieved of liability."

It was plaintiff's duty to prepare the machine for shipment and whether or not the damage resulted from its negligence in loading is a question of fact which must be determined from the evidence.

Petty, plaintiff's ditching machine operator, testified that he and the foreman Miley and two men from the truck were present when the machine was being loaded; that it did not usually take but two men to load the machine but he does not remember whether on not any colored helpers were present; that in preparing the machine for loading they pushed the conveyor

up in a vertical position and tied it with a rope which he had either bought in town for that purpose or which was a part of the plaintiff's equipment on the job. That they used the rope to hold the conveyor in place until they could get it on the truck and that they put a chain on it and tied it to keep it from falling down. The witness was thereupon asked the following:

"Q. You put a chain on it? A. Yes, sir, to chain that conveyor.

"Q. When? A. After I walked it up on the truck, put a chain on it then to keep it from falling down."

After mentioning the fact that the truck driver then fastened the machine on the truck body with chains, Petty stated that he was standing there when the truck pulled away and that the conveyor was then straight up and down and he had no recollection that it stuck out over the side of the truck, but he knows that it should not have; that the first time he saw the conveyor after it was damaged was when the patrolman and bridge operator had the truck driver stopped just off the upper end of the bridge at Jonesville; that when he arrived on the scene he asked what had happened and they said the conveyor hit the bridge and he told them that they had done some damage to the machine, but there was no further discussion and they made arrangements with the bridge operator to pay the damage to the bridge and the patrolman told them they could proceed.

Miley, plaintiff's foreman, testified that he helped load the machine on the truck and that Petty and two boys who came down on the truck were present. No one else is mentioned as being present. He was then questioned as follows:

"Q. When the machine was made ready to put on the truck, was anything done with regard to the conveyor? A. Yes, Sir, took the bolts out, folded it up and tied it up with rope and loaded it on the truck.

"Q. What was the purpose of tying it with rope and how did you come to use rope? A. A conveyor like that is pretty heavy and we put the rope on, and some pushed up and others pulled off and kept the conveyor in position.

"Q. Why were you using rope? A. To help the conveyor up.

"Q. After the conveyor was up, what was the use of the rope? A. We tied it up and put the chain on it to hold it.

"Q. What was done with the rope then? A. It was left on, if I remember right.

"Q. Who placed the chain on it, if a chain was put on it? A. The truck driver.

"Q. Anything said to them about putting the chain on it? A. Yes, sir, he was going to put a boomer on it at that time and I decided not, on account of putting too much pressure on it."

After describing the boomer and its function, the witness explained that if the chain was pulled too tight you ran the risk of springing the conveyor and he said that he did not want a boomer used for that reason, and "we hooked it up, and tied it up with a chain to keep it from springing —the chain was between 1¼ and 1½ inches in diameter." In response to further questioning he stated that when the truck departed the conveyor was fastened with a rope and chain; that the rope was about ¾ inches in diameter and that it had theretofore been used on the job and was not a new rope.

On cross-examination Miley was asked who applied the chain and he gave this response: "Between all of us, we all pulling on it, myself, Jenkins the operator." Under further questioning Miley testified that he helped put it on and passed it around the conveyor but does not remember how long the chain was or how many wraps were taken. In almost the same breath he said that he passed it around the conveyor and machine "just one time which could hold anything" and that the chain was tied, but how he was unable to say, because he did not tie it. This is the extent of plaintiff's testimony.

Heflin, a helper on the truck, described the loading of the machine in this fashion. He said two or three of them were holding the conveyor up and they were going to take a chain which was available as part of the truck's equipment and tie it up there and hold it in place, but Petty, the ditching machine operator said "You better not do

that, we got a rope here." Then somebody said: "Better put the rope on, because the chain is liable to bend it out of shape"; and this party who undoubtedly was the foreman then went to plaintiff's toolhouse and got the rope and Petty tied it up. After the machine was loaded, Heflin says that he had the following colloquy with the foreman, "Do you think that this rope will hold it down, we had better put a chain on there?" And he said: "No, the rope will hold it all right." And Heflin said: "You should know." Heflin described how this caterpillar type machine was fastened to the body of the truck with a chain and binders to secure it in place. He told of the numerous inspections made and of the care and caution exercised to transport the machine safely to destination. He further stated that when he got to the bridge at Jonesville where the accident happened he was riding on top of the machine to see to it that the machine did not come in contact with anything; that while on the bridge they removed a pan to give them the needed clearance and after inspecting the rope and finding it intact he then took a position on the back of the truck where Jenkins, the driver, could see him and where he could see the conveyor. That he did not see the conveyor at the precise moment when it fell because he was looking at the top and when it fell it hit the bridge and he holloed to the driver who stopped as quickly as possible. That when the conveyor fell the truck was from three to four feet from the side of the bridge and had proceeded only a short distance at the rate of about a mile or a mile and a half an hour; and that the reason why the conveyor fell was because the rope which fastened the conveyor in an upright position broke on account of friction, and permitted the conveyor to drop toward a horizontal position, so that it fouled an upright member of the bridge. After the accident he and the driver aided by others raised the conveyor to its former position, tied a chain around it for the first time, and secured it with a boomer and proceeded on to their destination without further damage to the conveyor.

Jenkins, the truck driver, testified that when he arrived to pick up the truck, Petty and the superintendent were present and they had with them two or three negro laborers to assist in preparing the machine for loading. That upon observing the width of the machine he asked the operator and the other gentleman who had not been introduced to him if something could not be done to reduce the overall width of this machine and this gentleman told him he could take out two bolts and loosen two more and pull the conveyor up against the side of the machine in almost a perpendicular position and he judged that this would make it then about eight feet wide which was the width of his truck. Jenkins testified that the foreman, with the assistance of the operator and the two negroes and possibly his truck helper who was standing by, raised the conveyor to a perpendicular position without the use of a rope. Following this statement he was questioned as follows:

"Q. Then how was it secured in that position? A. It was tied with a rope that the superintendent on the construction job secured from some place.

"Q. Who suggested the use of the rope? A. The superintendent or the operator one. I don't remember it, but I am almost sure both of them.

"Q. Did you make any suggestions? A. Yes. I wanted to put a chain in a steel head binder in order to be sure it was held in place.

"Q. Why didn't you? A. These gentlemen seemed to agree while it was less bother if the chain was put on the conveyor tight, it would stand a chance of springing the conveyor, which would keep the belt from staying direct in line on the conveyor, it would spring it out of line, and if they tied it with a rope, it wouldn't be that tight to spring.

"Q. After the conveyor was fastened into place, then how did they get the machine on the truck? A. It pulled itself on, on its own power.

"Q. And after it was on the truck, how was it secured and who secured it? A. The helpers on the truck and myself put four chains on it and crossed the chains on each side, two ahead and two back.

"Q. Was anything done to the conveyor to hold it upright? A. No, sir."

And in respect to the accident he had this to say in response to the following questions:

"Q. What happened at Jonesville? A. The bridge was between Natchez and Jonesville. We pulled up to the bridge to find out how much clearance we had and to be sure we didn't hit. We went through the first two pieces over the bridge crossways at the top without any trouble, but when we came to the third bar across the top we had to stop, because it would not clear. We got up on the machine with wrenches and took out ten or twelve bolts and we took out the steel pan. By taking that out I believe we got about six inches more clearance.

"Q. You are talking about top clearance? A. Top clearance, yes, sir.

"Q. Then what happened? A. I got back in the truck and proceeded across the bridge. Heflin stayed back on the machine to see that it would not hit anything else. We were there with it on the lower part of the bridge then. We were running not more than a mile or a mile and a half per hour.

"Q. Then what happened? A. As I approached the end of the bridge, approximately from forty to sixty feet, I heard a noise and it stopped me. I didn't have any speed and I didn't have any momentum. I found out after that the conveyor had struck the upright rails of the bridge. If I had had some speed up, it would have torn it entirely loose from the machine and without stopping the truck, going so slowly, I didn't have momentum, and when the conveyor struck that beam it stopped.

"Q. Did you examine to see what caused the conveyor to come down? A. Yes, sir, we looked up immediately and discovered that the rope was broken.

"Q. Then what did you do? A. We got our chain and binders out and began pulling back up. There was only two of us and it took more than two men to put it in an upright position and then we got the order from the bridge so we could proceed on the bridge.

"Q. Which side of the bridge did the conveyor come down on? A. On the right.

"Q. How far was the truck from the righthand side of the bridge when it stopped? A. At least three feet.

"Q. You saw the ditching machine on the truck after it was loaded at Centreville, Mississippi? A. Yes, sir.

"Q. Did any part of it extend out through the side of the truck then? A. Not that I noticed. I didn't have measurements or plummet line that I could measure with, but if it protruded at all it was not over an inch or two.

"Q. Did it shift from the time it was loaded to the time this accident happened? A. No, sir."

After the accident Jenkins says he looked up immediately and observed that the rope had broken; that when he examined the rope to see its condition it had every appearance of having rubbed against an angle iron or around a corner and had been severed almost in two. That he knows that the conveyor had not fallen down before it fell and hit the bridge for they had only proceeded about one hundred feet after removing the pan for top clearance when the accident happened. That after the accident the conveyor was fastened with a chain and binder for the first time and they proceeded to destination without incident or further damage to the machine.

As can be seen, there is a sharp conflict in the testimony. Two witnesses for the plaintiff testify unequivocally that in preparing the machine for loading a chain was used to secure the conveyor in an upright position, while witnesses for the defendant in equal number swear that a chain was not applied until after the accident. This inconsistency in the testimony in respect to this material fact cannot be explained or reconciled and the court must determine who spoke truthfully.

 Of the four witnesses all, save Miley, have since the institution of this suit severed their relationship with their former employer. The witness Miley therefore occupies a different status and his interest in the outcome of this suit by his employer is an element to be considered in weighing his testimony. The Indien, 9 Cir., 71 F.2d 752. Another element to be borne in mind is the fact that Miley was the

superintendent and as such was chargeable with the responsibility of preparing the machine for shipment. In addition it will be remembered that his testimony was not free from contradiction and ambiguity. Now looking to the surrounding circum-stances, it will be noted that the conveyor fell from the perpendicular to the horizontal position because either the fastening or the fastenings, gave way. In resolving this question in the light of the probabilities, it is certainly more reasonable to believe, as I do, that the conveyor was secured with a rope and that a chain was not applied prior to the accident than it would be to conclude otherwise, because it is much more unlikely that the rope could have broken and the chain come untied than for only the rope to have broken.

█ Having reached the conclusion that a chain was not applied prior to the accident I experience no difficulty in finding under well settled rules of construction that plaintiff declined the suggested use of a chain and binder because it did not wish to incur the risk of springing the conveyor out of line. Plaintiff assumed the risk of loading the machine and the injury having occurred solely by reason of the fact that the machine had been improperly or defectively loaded, it would seem on principle that the carrier should be relieved of liability. Ross v. Troy & Boston Railroad Co., 49 Vt. 364, 24 Am.Rep. 144; Miltimore and others v. Chicago & Northwestern Railway Co., 37 Wis. 190; Hines v. Buchanan, 131 Va. 88, 109 S.E. 219; Snowden v. Tremont & G. R. Co., La.App., 140 So. 122; Alabama & V. R. Co. v. American Cotton Oil Co., 5 Cir., 249 F. 308.

█ In any event where, as here, damage is shown to have resulted from the acts of the shipper in loading, the carrier is exempt from liability unless the plaintiff proves that the defendant was guilty of some negligence in not providing for the safety of the machine. The test to be applied is not the hindsight test but the foresight test. The question is: Could the carrier reasonably have anticipated that damage would be caused by such acts of the shipper in preparing the machine for shipment? Alabama & V. R. Co. v. American Cotton Oil Co., supra.

The evidence in this case shows that the conveyor was about 14 feet long, 25⅜ inches wide and weighed approximately 1,000 pounds; that when raised in an upright position its weight was supported at the base where it was joined with two bolts to the body of the frame; that plaintiff's only purpose in putting a rope around the conveyor was to secure it to the side of the machine in a perpendicular position and a ¾ or ⅞ inch manila rope was used and it was wrapped around the conveyor twice and tied. It further appears that the conveyor was equipped with walking and trough rollers whose bearings were worn and loose and this circumstance though not necessarily significant is deemed worthy of mention because the rope was examined after the accident and it bore every appearance of having rubbed against an angle iron or sharp corner for it had been severed almost in two. These physical facts standing alone as they do without amplification or additional detail do not suggest to the court that ¾ inch manila rope which has a known breaking strength of 700 pounds would, if properly applied, fail to hold the conveyor securely in place. Nor can the court on this record say that the carrier could reasonably have anticipated that damage would result from the acts of the shipper in loading. Heflin, the truck helper, testified that he had considerable experience as a rigger but he did not know "too much" about "the value of stress on rope." He knew as did the truck driver and plaintiff's employees that a chain in a steel head binder would surely hold the conveyor in place and for that reason he suggested its use. But he did not know and consequently it was not apparent to him at the time of the loading that the machine could not safely be carried in its then condition, otherwise he would not have asked the foreman: "Do you think this rope will hold it down? * * *" And when the foreman replied, "No, the rope will hold it all right," Heflin, who did not know, was content to rely upon the foreman's superior knowledge that the loading was proper for he replied: "You should know." But even if the carrier did know that the machine was not properly prepared for shipment, which is not the situation here, plaintiff

would doubtless be precluded from recovery under the Snowden case, supra.

The evidence in this case clearly shows that the carrier exercised all proper diligence in providing for the safety of the machine and that the damage was not the result of its negligence and would not have occurred had not the plaintiff been negligent in loading the machine. It follows that the carrier is relieved of liability and that plaintiff's action should be dismissed and the Clerk is instructed to enter judgment accordingly.